UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOORIN BROS., INC.,

Plaintiff,

v.

GOLDSTARHAT LLC,

Defendant.

Case No. 24-cv-05579-RS

**ORDER GRANTING IN PART, DENYING IN PART MOTION FOR ENTRY OF DEFAULT JUDGMENT**

## I. INTRODUCTION

Plaintiff Goorin Bros., Inc. sued Defendant GoldStarHat LLC in August 2024, averring trademark and trade dress infringement as well as violations of the California Unfair Competition Law ("UCL"). A hat-maker, Plaintiff claims that Defendant sells competing hats online that feature Plaintiff's trademark trapezoid design mark and copy Plaintiff's trade dress, including non-functional elements of the "trucker" style and animal images centered within a square patch. Plaintiff seeks an injunction to restrain Defendant from using the design marks and trade dress as well as damages to the tune of $1.41 million, plus $1 million in punitive damages. Defendant having failed to appear or respond to the complaint, Plaintiff now moves for entry of default judgment. For the reasons explained below, the motion is granted in part and denied in part.

## II. BACKGROUND

Plaintiff served Defendant with a summons and complaint in November 2024. Defendant has never appeared, responded, or made any attempt to engage in the legal process. Plaintiff subsequently filed an application for entry of clerk's default and served the application on

Defendant.  On December 31, 2024, the Clerk entered default against Defendant for failure to appear, answer, or otherwise plead to the complaint.  That order of entry of default was served on Defendant on January 7, 2025.

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 55, entering a default judgment is a two-step process.  Prior to entry of a default judgment, there must first be an entry of a default.  Fed. R. Civ. P. 55.  Only then may a district court, in its discretion, grant relief upon an application for default judgment.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  In exercising such discretion, the court may consider: "(1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits."  *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  To conduct this analysis, all factual allegations in the complaint are taken as true, except for those relating to damages.  *TeleVideo Sys. Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).  Other competent evidence submitted by the moving party may be deemed admitted by the non-responding parties.  *See Shanghai Automation Instrument Co., v. Kuei*, 194 F.Supp.2d 995, 1000 (N.D. Cal. 2001).

### IV. DISCUSSION

**A.  Jurisdiction and Service**

A court must confirm that it has both subject matter and personal jurisdiction prior to assessing the merits of a default judgment.  *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  It must also "ensure the adequacy of service on the defendant."  *Produce v. Cal. Harvest Healthy Foods Ranch Mkt.*, No. 11-cv-4814, 2012 WL 259575, at *2 (N.D. Cal. Jan. 27, 2012).

Subject matter jurisdiction over Plaintiff's trademark and trade dress claims exists pursuant to 28 U.S.C. § 1331 because they are questions of federal law.  Supplemental jurisdiction over Plaintiff's state and common law claims exists under 28 U.S.C. § 1367(a) because they arise out of

the same case or controversy as Plaintiff's federal claims.  Personal jurisdiction is likewise satisfied here, where Defendant has sold at least one "physical product via an interactive website and caused that product to be delivered to a forum state." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 755 (9th Cir. 2025) (en banc) (citing *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1095 (9th Cir. 2023)); *see also* Goorin Decl., Dkt. No. 16-2, ¶ 10 (describing how Plaintiff purchased and received a hat from Gold Star's website).  Such sales "must occur as part of the defendant's regular course of business," *see Herbal Brands*, 72 F.4th at 1094, which seems to be the case here, given that Gold Star is in the business of selling hats online.  Although Plaintiff has demonstrated that only one product was distributed in California, there is no reason to doubt that contact was Gold Star's "own choice and not 'random, isolated, or fortuitous,'" even granted the fact that Gold Star "cultivates a 'nationwide audience[] for commercial gain.'" *Briskin*, 135 F.4th at 758 (first quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2001), then quoting *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011)).

Service was also proper.  Rule 4(e) of the Federal Rules of Civil Procedure governs the methods by which service may be effectuated.  Rule 4(e)(1) permits service by any means allowed by the law of the state in which the case is pending, or the state in which the defendant resides. Rule 4(e)(2) permits service by (1) personal delivery of the summons and complaint to the defendant, (2) leaving a copy of each with a person at the defendant's residence, or (3) leaving a copy of each with an agent authorized to accept service.  California law also permits service on a corporation by "delivering a copy of the summons and the complaint ... to the person designated as agent for service of process."  Cal. Civ. Proc. Code § 416.10(a).  Following a stake-out by hired process servers, Plaintiff served German Almonte, Defendant's registered agent for service of process, on November 9, 2024, and filed the proof of service form on November 13, 2024.

### B.  The *Eitel* factors

In this matter, certain *Eitel* factors are beyond dispute.  The default does not appear to have arisen due to excusable neglect, given the proper service that Plaintiff conducted and Defendant's apparent unwillingness to participate in this lawsuit.  Possibility of prejudice to Plaintiff is also high considering the alleged misuse of Plaintiff's trademark and trade dress; absent a default

1    judgment, Defendant's refusal to engage with Plaintiff's claims would leave Plaintiff with no

2    means of redressing the alleged violations.

3        Other *Eitel* factors require closer examination.

4            *1.    Merits of Substantive Claims and Sufficiency of Complaint*

5        "Under an *Eitel* analysis, the merits of Plaintiff's substantive claims and the sufficiency of

6    the complaint are often analyzed together.  These two factors require that . . . allegations 'state a

7    claim on which the [plaintiff] may recover.'"  *Nat'l Council of United States, Soc'y of St. Vincent

8    De Paul, Inc. v. Del Norte Council of Soc'y of St. Vincent De Paul*, No. 23-cv-01556-RS, 2024

9    WL 3924555, at *3 (N.D. Cal. Aug. 23, 2024) (quoting *Danning v. Lavine*, 572 F.2d 1386, 1388

10    (9th Cir. 1978)).

11            a)    <u>Trademark Infringement</u>

12        To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114,

13    a party must prove: "(1) it has a protectible ownership interest in the mark; and (2) the defendant's

14    use of the mark is likely to cause consumer confusion."  *Network Automation, Inc. v. Advanced

15    Systems Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (internal citation omitted).  Federal

16    registration of a trademark is prima facie evidence of the validity of a mark.  *Zobmondo Entm't v.

17    Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010). Here, Plaintiff owns two federally

18    registered trademarks: one bearing Goorin's insignia in a particular pentagon shape, and the other

19    comprising the same pentagon shape only.  *See* Compl. ¶ 15.  Plaintiff next must show the

20    "alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be

21    confused as to who makes that product." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th

22    Cir. 2008) (citations omitted).  Plaintiff has shown Defendant uses its marks in commerce without

23    license to do so and receives payments through said use.  Moreover, the facial similarity between

24    Plaintiff's and Defendant's products evinces a strong likelihood of confusion: they are basically

25    the same hats.  At any rate, Defendant's default means that the well-pled allegations in the

26    complaint—including the averments about Gold Star creating a likelihood of confusion—are taken

27    as true.  *See TeleVideo*, 828 F.2d at 917.

28

Though it is unnecessary to go through each of the *Sleekcraft* factors (which can be used to guide a likelihood of confusion analysis) in these circumstances, an analysis of those factors also demonstrates that Plaintiff has pled facts sufficient to show likelihood of confusion.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (listing factors, including "the similarity of the marks").  Taken together, Plaintiff's allegations adequately plead trademark infringement under the Lanham Act.[1]

    b)  Trade Dress Infringement

"Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989).  To establish infringement of an unregistered trade dress, Plaintiff must demonstrate: "(1) the trade dress is nonfunctional, (2) the trade dress has acquired secondary meaning, and (3) there is a substantial likelihood of confusion between the plaintiff's and defendant's products." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 754 (9th Cir. 2018).

Plaintiff asserts its trade dress consists of a trucker style hat with animal images centered within a square-framed patch on the front.  Plaintiff further avers that such dress "is non-functional in its entirety, visually distinctive, and unique in the headwear industry."  Compl. ¶ 44–45.  The hats are apparently one of Goorin's most well-recognized and commercially successful styles and have garnered unsolicited media attention when various celebrities have been seen wearing them. *Id.*  ¶ 46.  These averments suffice to meet the first two elements of the trade dress infringement claim.  Plaintiff has also plead a likelihood of customer confusion, *see, e.g.*, *id.* ¶ 50, which, as shown *supra*, is bolstered by the obvious similarities between its hats and Defendant's allegedly

---

[1] Plaintiff brought claims for unfair competition and common law trademark infringement under California law in addition to its Lanham Act claims. California trademark claims are "substantially congruent" to federal trademark claims and need not be examined separately. *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.,* 354 F.3d 1020, 1024 n.10 (9th Cir. 2004).

United States District Court
Northern District of California

infringing products.  In this regard, the complaint plausibly avers that Defendant's products "actually dupe[]" consumers.  *Benefit Cosms. LLC v. E.L.F. Cosms., Inc.*, No. 23-cv-00861-RS, 2024 WL 5135604, at *17 (N.D. Cal. Dec. 17, 2024).  Plaintiff therefore sufficiently states a claim for trade dress infringement.

c) Unfair Competition

To prevail on its unfair competition claim, Plaintiff must prove Defendant engaged in "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The complaint adequately avers such practice via the trademark and trade dress infringement claims discussed *supra*.

2. *Sum of Money at Stake*

The "money at stake" *Eitel* factor "pertains to the amount of money at stake in relation to the seriousness of [d]efendant's conduct."  *Elias v. Allure SEO*, No. 20-cv-06031, 2022 WL 2755351, at *2 (N.D. Cal. July 14, 2022) (citation omitted).  Plaintiff's complaint sought all damages available under 15 U.S.C. § 1117, as well as an order requiring Defendants to disgorge their profits or pay a reasonable royalty, attorneys' fees, restitution, and any further relief deemed just and proper.  Compl. at 14–15.  In its motion for default judgment, Plaintiff further specified that it seeks $1.41 million in damages; $46,777.50 in attorneys' fees and costs; and $1 million in punitive damages, plus interest.  *See* Mot., Dkt. No. 16-3 at 4.

"When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged."  *Bd. of Trs. v. Core Concrete Const., Inc.*, No. 11-cv-2532-LB, 2012 WL 380304, at *4 (N.D.Cal. Jan. 17, 2012) (citing *Eitel*, 782 F.2d at 1472).  Yet, when "the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate."  *Id.* (citations omitted).  Here, Plaintiff has sought to tailor the requested $1.41 million in damages to the alleged specific misconduct.  Under the Lanham Act, plaintiffs may recover a defendant's profits plus any damages they sustain and the costs of the action.  *See* 17 U.S.C. §1117(a); *see also, Jason Scott Collection v. Trendily Furniture, LLC*, 68 F.4th 1221–22 (9th Cir. 2023).  Trademark damages, like tort damages, are assessed by the reasonably

foreseeable harm caused by the infringement. *Jason Scott Collection*, 68 F.4th at 1220–21. Where the parties are competitors, the defendant's profits can serve as a rough measure of the plaintiff's lost profits. *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 121 (9th Cir. 1968). ). "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 17 U.S.C. §1117(a).

Plaintiff calculates that it has suffered at least $150,000 in lost profits caused by Defendant's alleged conduct and requests three times that amount (i.e., $450,000) in actual damages pursuant to Section 1117(a). Plaintiff also calculates that Gold Star has earned at least $1.92 million in revenue from sales of the allegedly infringing products, based on extrapolated estimates from Amazon reviews. Dkt. No. 16 at 26; see also Goorin Decl. ¶¶ 9–11. To ensure that principals of equity are observed, however, Plaintiff only seeks 50% of that sum, or $960,000. Together with the $450,000 in lost profits, Plaintiff therefore seeks $1.41 million in compensatory damages. Plaintiff separately seeks $1 million in punitive damages, highlighting that Defendant has ignored take down notices and appears to have tried hiding its ongoing infringements by removing the trademark from online photos.

Although the relief awarded will be less than the amount sought, as explained *infra*, the sum of money at stake is tailored, however roughly, to Defendant's misconduct. This factor favors granting the default judgment.

### 3. Possibility of a Dispute over Material Facts

With respect to the possibility of a dispute over material facts, Defendant has not participated in this action to date. No attempts to contest the material facts or assertions have been made, despite ample opportunity for Defendant to do so. There appears little to no possibility of a dispute over material facts.

### 4. Policy Favoring Judgment on the Merits

The Federal Rules of Civil Procedure evoke a preference for decisions on the merits. However, considering the extent to which the other *Eitel* factors all weigh in favor of default

1    judgment, this factor does not preclude granting the motion.  To the contrary, and on the whole,

2    entry of default judgment is appropriate in this case.

3        **C. Scope of Relief**

4        Following the entry of default, well-pleaded factual allegations in the complaint are taken

5    as true, except as to the amount of damages.  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906

6    (9th Cir.2002).  To recover damages, Plaintiff must prove the relief it seeks through testimony or

7    written affidavit.  *Bd. of Trs. of the Boilermaker Vacation Trust v. Skelly, Inc.*, 389 F.Supp.2d

8    1222, 1226 (N.D. Cal. 2005); *see PepsiCo, Inc.*, 238 F.Supp.2d at 1175 (citing *TeleVideo Sys.,*

9    *Inc.*, 826 F.2d at 917–18).  "[A] default judgment for money may not be entered without a hearing

10   unless the amount claimed is a liquidated sum or capable of mathematical calculation."  *Davis v.*

11   *Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981).

12       *1.  Compensatory Damages*

13       Plaintiff provided calculations for the $1.41 million in compensatory damages that it seeks,

14   as discussed *supra*.  Those calculations, however, substantially rely on conjecture.  Goorin first

15   estimates that it has suffered at least $150,000 in lost profits and actual harm as a result of Gold

16   Star's conduct, a figure which it then triples as permitted by the relevant statute, totaling $450,000

17   in statutory damages.

18       Goorin further estimates that, because one of Gold Star's products has received 140

19   reviews on Amazon, and assuming that "only a small fraction of the overall purchasers leave a

20   review," Defendant must have sold at least 1,000 units of each of its 48 infringing products.  At

21   roughly $40 per hat, Plaintiff argues, Gold Star's gross sales must be $1.92 million—a figure

22   which Plaintiff then halves "to hedge its estimates" and in light of equitable principles.  That

23   amount, when combined with the $450,000 in statutory damages, totals to the $1.41 million in

24   compensatory damages sought.

25       Just because one of Gold Star's products received 140 reviews does not mean that their

26   other products likely received as many; indeed, at the hearing on the matter, counsel conceded that

27   the hat receiving 140 reviews was the most reviewed Gold Star hat available.  Because that

28

1    product appears to be an anomaly, it is not an appropriate standard for the other hats.  Even

2    accepting as true the notion that less than 10% of purchasers leave reviews, the fact remains that

3    many of the other infringing products have but one review.  It would therefore make no sense to

4    conclude that 1,000 units of those particular hats were sold; that would suggest only .001% of

5    purchasers leave reviews, contrary to the very premise Plaintiff itself seeks to use.

6              Plaintiff appears to have accounted for these uncertainties by halving the total estimated

7    gross sales from $1.92 million to $960,000.  Such an effort, however, is insufficient.  As noted

8    *supra*, a default judgment for money may not be entered without a hearing where—as here—the

9    amount claimed is not a liquidated sum or capable of mathematical calculation.  *See Fendler*, 650

10   F.2d at 1161.  The court therefore held a hearing to discuss whether more precise estimation of the

11   damages was possible.  At the hearing, Plaintiff conceded that multiplying the number of reviews

12   and ratings total by the incidence of reviews per purchases, and then again by the average sale

13   price, would be a more accurate means of estimating the damages.  Plaintiff subsequently provided

14   support (a magazine article citing consumer research) for its belief that only 5 to 10 percent of

15   Amazon customers leave reviews.  Plaintiff also highlighted the extent to which many Amazon

16   users leave star ratings rather than reviews, suggesting these might also factor into the analysis.

17   Finally, Plaintiff provided evidence that the hats are being sold on other websites that don't track

18   reviews, as well as in a brick and mortar store.

19             The record reflects there are 70 reviews and 433 ratings on Amazon for infringing hats.

20   Although it is a crude measure to combine the two types of feedback (as some reviews might be

21   responsible for corresponding ratings), there appear many sites on which no reviews are possible,

22   such that the risk of overcounting Amazon purchases is somewhat mitigated by the risk of

23   undercounting the unknown quantity of purchases from other sites.  Roughly speaking, if there are

24   500 reviews or ratings about the hats, the record suggests at least 5,000 or as many as 10,000 hats

25   have been sold.  The average price appears to be $40, which would suggest damages of at least

26   $200,000 or as much as $400,000.  In light of the fourteen other sites on which Defendant markets

27   infringing products, the higher end of the estimated range is most appropriate in this equitable

28

United States District Court
Northern District of California

1  context. Indeed, that these calculations are somewhat uncertain is not Plaintiff's fault, of course—

2  more precise figures might have resulted had Defendant engaged with the legal process and

3  participated in discovery. To be sure, the amount of damages here *is* capable of mathematical

4  calculation; necessary inputs are simply missing, solely due to Defendant's intransigence.

5  Plaintiff's request to triple the statutory damages to $450,000 is also well-taken. Although

6  they provide scant reasoning for tripling the statutory amount, Defendant's conduct (and, in

7  particular, its refusal to engage in this case, even while apparently removing the trademarks from

8  photos of the hats online) is sufficiently egregious to warrant such tripling. In total, Plaintiff is

9  therefore entitled $850,000: $400,000 in actual damages and $450,000 in statutory damages.

10  ### 2. Punitive Damages

11  Plaintiff also seeks $1 million in punitive damages, a request that is insufficiently

12  supported. At the start, the complaint fails to specify the amount of punitive damages sought, only

13  stating that Plaintiff seeks punitive damages "in an amount sufficient to deter similar misconduct

14  in the future." Compl. ¶ 72; *see also id.* ¶ 60. "Because those formulations are not for a

15  'liquidated sum or capable of mathematical calculation,' it is questionable whether an award of

16  punitive damages could be imposed via default judgment based solely on the complaint." *MLB*

17  *Sales Inc. v. RK Gems LLC*, No. CV-23-01526, 2024 WL 520638, at *5 (D. Ariz. Feb. 9, 2024).

18  Plaintiff does persuasively argue that punitive damages "are particularly appropriate given

19  that Gold Star acted with fraud, oppression, and malice—in conscious disregard of Goorin's

20  rights—as evidenced by the fact that it ignored Goorin's take down notices, then tried to hide their

21  ongoing infringements." Mot. at 26–27. Yet, that fact is already accounted for in the tripling of

22  statutory damages, and it is insufficient to warrant punitive treatment here.

23  ### 3. Injunctive Relief

24  Plaintiff further seeks injunctive relief to protect its competitive standing and brand. To

25  obtain a permanent injunction, a plaintiff must establish: (1) that it has suffered an irreparable

26  injury; (2) that the remedies available at law are inadequate to compensate for that injury; (3) that

27  the balance of hardships weigh in the plaintiff's favor; and (4) that the public interest would not be

28

disserved by a permanent injunction.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Plaintiff asserts loss of control over its own valid marks due to Defendant's conduct.  This injury qualifies as irreparable harm and merits permanent injunctive relief.  *See CytoSport, Inc. v. Vital Pharms., Inc.,* 617 F. Supp. 2d 1051, 1080 (E.D. Cal.), *aff'd*, 348 F. App'x 288 (9th Cir. 2009) (finding a business's loss of control over marks and goodwill constitutes irreparable harm). Remedies at law are clearly inadequate to compensate Plaintiff. As to the balance of hardships, the absence of a permanent injunction would cause further irreparable harm to Plaintiff, which has shown Defendant is unwilling to engage.  On the other hand, a permanent injunction would only bring Defendant into compliance with the law by ceasing its infringing activities.  *See, e.g., Daimler AG v. A-Z Wheels LLC,* 498 F. Supp. 3d 1282, 1294 (S.D. Cal. 2020) (holding a permanent injunction requiring a defendant to halt its infringement would not harm the defendant); *Harman Int'l Indus., Inc v. Pro Sound Gear, Inc.,* No. 2:17–cv–06650–ODW, 2018 WL 1989518, at *8 (C.D. Cal. Apr. 24, 2018) (finding balance of hardships weighed against defendant because permanent injunction would merely guarantee defendant's compliance with the Lanham Act). The balance of hardships thus tips in Plaintiff's favor.  Finally, the public interest is served by protecting valid and subsisting trademarks.  Thus, the sought-after injunctive relief is warranted and granted as explained further below.

4.  *Attorneys' Fees*

Goorin appropriately contends that it ought to receive its reasonable attorneys' fees, as provided under the Lanham Act.  *See* 16 U.S.C. § 1117(a).  Generally, such fees are available only in exceptional cases, such as when the infringing acts are malicious, fraudulent, or deliberate.  A default judgment like the one here can sometimes establish as much.  Significantly, awards of attorneys' fees have been upheld "solely because, by entry of default judgment, the district court determined, as alleged in [plaintiffs'] complaint that [defendants] acts were committed knowingly, maliciously, and oppressively, with an intent to . . . injure [plaintiffs]." *Derek Andrew, Inc. v. Proof Apparel Corp.,* 528 F.3d 696, 702 (9th Cir. 2008) (citation and internal marks omitted).

ORDER GRANTING DEFAULT JUDGMENT
CASE NO.  24-cv-05579-RS

11

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Goorin highlights Gold Star's averred conduct, and in particular, its apparent continued use of Goorin's marks without permission even after receiving take-down notices. This activity, when combined with the apparent doctoring of images in response to this litigation, suffices to show willful conduct that entitles Goorin to attorneys' fees. *See, e.g.*, *Allergen Inc. v. Mira Life Grp. Inc.,* 2004 WL 2734822 at *4 (C.D. Cal. June 9, 2004).

Goorin seeks $41,097.25 in attorneys' fees and $5,680.25 in costs—the latter number including, among other things, the cost of staking out Gold Star's registered agent in Georgia so as to serve him with the complaint and summons. Courts determine reasonable attorney fees according to the lodestar analysis, which multiplies the number of hours reasonably expended on the matter by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The party seeking fees bears the initial burden of establishing the hours expended litigating the case and must provide detailed time records documenting the tasks completed and the amount of money spent. *Id.* at 434; *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945–46 (9th Cir. 2007). The requesting party also has the burden to demonstrate that the rates requested are "in line with the prevailing market rate of the relevant community." *Carson v. Billings Police Dep't*, 470 F.3d 889, 891 (9th Cir. 2006). Generally, "the relevant community is the forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (internal citations omitted). Typically, fees calculated under the lodestar method are presumed to be reasonable. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1208-09 (9th Cir. 2013). However, the court has the discretion to adjust this figure "if circumstances warrant" it, and "should…exclude from the lodestar fee calculation any hours that were not 'reasonably expended,' such as hours that are excessive, redundant, or otherwise unnecessary." *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001); *Rodriguez v, Barrita, Inc.*, 53 F.Supp.3d 1268, 1281 (N.D. Cal. 2004) (quoting *Hensley*, 461 U.S. at 433–34). Additionally, the court may "impose a small reduction, no greater than 10 percent—a 'haircut'—based on its exercise of discretion and without a more specific explanation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008).

When conducting the above analysis in the context of a default judgment, the lack of a

1    party to "challenge an application for attorney's fees and costs does not mean that a court should

2    rubber-stamp the request." *Cognizant Technology Solutions U.S. Corporation v. McAfee*, No. 14-

3    cv-01146-WHO, 2014 WL 3885868, at *2 (N.D. Cal. Aug. 7, 2014). Rather, the principle of

4    procedural fairness counsels a court to scrutinize such a request more closely. *See id.*

5         Counsel represents that Tracy B. Rane, counsel with Kibler Fowler & Cave LLP,

6    principally handled this matter, working 56.50 hours at a rate of $595 per hour.  Rane received

7    assistance from senior associate Kevin Cammiso, who billed 14.75 hours at a rate of $595 per

8    hour.  The paralegals who worked on the case, Praveeta Garcia and Megan Schneider, billed

9    nearly 19 hours combined, at a rate of $195 per hour.  In these hours, counsel represents that they

10   completed a litany of tasks, including the identification and analysis of Goorin's protectable trade

11   dresses and marks; investigation of Gold Star's products; analysis and drafting of infringement

12   claims; examining Gold Star's corporate structure, domicile, agent for service of process, and

13   potential addresses for service; coordinating the process server's stake out; drafting and filing

14   request for entry of default; analyzing and presenting estimated damages; and, finally, drafting,

15   revising, and finalizing the motion for default judgment.

16        While counsel "is not required to record in great detail how each minute of his time was

17   expended," a fee request must contain "sufficient detail that a neutral judge can make a fair

18   evaluation of the time expended, the nature and need for the service, and the reasonable fees to be

19   allowed." *Hensley*, 461 U.S. at 437 n.12; *United Steelworkers of Am.v. Ret. Income Plan for*

20   *Hourly Rated Employees of ASARCO, Inc.*, 512 F.3d 555, 565 (9th Cir. 2008) (internal quotation

21   omitted).  Here, counsel has not provided the sort of billing sheet that is often used to prove up fee

22   requests.  Nevertheless, the information provided is sufficiently detailed, and the requests are

23   appropriately tailored to the local market.  The motion for fees and costs is therefore granted as

24   explained at more detail *infra*.

25                              **V. CONCLUSION**

26        Consistent with the reasoning explained above, Default Judgment is hereby entered in favor of

27   Plaintiff GOORIN BROS., INC. (hereinafter "Goorin"), and against the Defendant

28

GOLDSTARHAT LLC (hereinafter "Gold Star") as follows:

    1. Permanent Injunctive Relief: Gold Star and its officers, directors, employees, agents, subsidiaries, distributors, and all persons acting in concert and participation with Gold Star are hereby permanently restrained and enjoined from:

        a. manufacturing or causing to be manufactured, importing, advertising, or promoting, distributing, selling or offering to sell infringing goods bearing Goorin's trapezoid trademarks or Goorin's trade dress or any confusingly similar trademarks or trade dress, including those that are identified in Paragraphs 15, 17, and 18 of the Complaint [Dkt. 1] (hereinafter, the "Goorin Trademarks and Trade Dress"), or from continuing to use any of the marks that appear in Exhibit A of the Complaint.

        b. using any reproduction, copy, derivative, or colorable imitation of the Goorin Trademarks or Trade Dress or any other marks or designs that are confusingly similar thereto.

        c. using any logo, and/or layout that may be calculated to falsely advertise the services or products of Gold Star as being sponsored by, authorized by, endorsed by, or in any way associated with Goorin;

        d. falsely representing itself as being connected with Goorin through sponsorship or association;

        e. engaging in any act which is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Gold Star are in any way endorsed by, approved by, and/or associated with Goorin;

        f. using any reproduction, copy, or colorable imitation of Goorin's Trademarks or Trade Dress in connection with the publicity, promotion, sale, or advertising of any goods sold by Gold Star;

        g. affixing, applying, annexing, or using in connection with the sale of any goods, a false description or representation, including words or other symbols tending

United States District Court
Northern District of California

1    to falsely describe or represent goods offered for sale or sold by Gold Star as

2    being those of Goorin or in any way endorsed by Goorin;

3       h.  otherwise unfairly competing with Goorin;

4       i.  using the Goorin Trademarks or Trade Dress, or any confusingly similar works

5    on e-commerce marketplace sites, domain name extensions, metatags or other

6    markers within website source code, from use on any webpage (including as the

7    title of any web page), from any advertising links to other websites, from search

8    engines' databases or cache memory, and from any other form of use of such

9    terms which are visible to a computer user or server to direct computer searches

10    to e-commerce stores, websites, and/or Internet businesses registered, owned, or

11    operated by Gold Star; and

12       j.  effecting assignments or transfers, forming new entities or associations or

13    utilizing any other device for the purpose of circumventing or otherwise

14    avoiding the prohibitions set forth above.

15      2.  Additional Relief: Gold Star is hereby ordered to pay to Goorin as follows:

16       a.  Damages in the amount of $850,000;

17       b.  Attorneys' fees and costs in the amount of $46,777.50; and

18       c.  Interest from the date this action was filed, which shall accrue at the legal rate.

19    *See* 28 U.S.C. § 1961.

20    **IT IS SO ORDERED**.

21

22    Dated: August 26, 2025

23    _____

24    RICHARD SEEBORG
      Chief United States District Judge

25

26

27

28

United States District Court
Northern District of California